**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

WALTER HAYNES
ADC #111110                                                                                              PLAINTIFF


VS.                              CASE NO. 5:07CV00295 WRW/JTR


PATRICK L. STEPHENSON
Sergeant, Arkansas Department of Correction                              DEFENDANT


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

### I.  Introduction

On November 13, 2007, Plaintiff, Walter Haynes, filed this section 1983 action against Larry

Norris, Director of the Arkansas Department of Correction ("ADC"); Larry May, Assistant Director

of the ADC; David White, Warden of Tucker Maximum Security Unit ("TMSU"); and Sgt.

Patrick L. Stephenson, a correction officer at TMSU.  (Docket entry #2.)  On January 7, 2008, United

States District Judge William R. Wilson, Jr., entered an Order (docket entry #10) dismissing, at the

screening stage, Plaintiff's claim against Defendant Norris.[1]  On July 29, 2008, Judge Wilson entered

an Order (docket entry #56) granting the Motion for Partial Summary Judgment filed on behalf of

Defendants White and May.[2]  (Docket entry #33.)

Plaintiff's only surviving claim was against Defendant Stephenson.  According to Plaintiff's

Complaint, at "approximately 8:40 a.m." on June 22, 2007, Defendant Stephenson cursed and

---

[1]In doing so, Judge Wilson adopted this Court's Recommended Partial Disposition.  (Docket entry #7.)

[2]Once again, Judge Wilson adopted this Court's Recommended Partial Disposition.  (Docket entry #49.)

threatened him in violation of the ADC's Policy on Corporal Punishment.[3]  On June 23, 2007,

Plaintiff filed an informal resolution, the first step in the ADC's grievance procedure.  The informal

resolution detailed the profanity used by Defendant Stephenson and the threat he made against

Plaintiff.[4]

On June 27, 2007, Defendant Stephenson learned that Plaintiff had filed the informal

resolution accusing him of using profanity and making a threat.  He immediately filed a June 27

disciplinary against Plaintiff, which charged him with making "false statements" in the June 23

informal resolution.  According to Plaintiff's Complaint, Defendant Stephenson filed this

disciplinary in *retaliation* for Plaintiff filing the June 23 informal resolution.  If proven, this

allegedly retaliatory disciplinary would constitute a clear violation of Plaintiff's First Amendment

right to access the courts.[5]

On August 27, 2008, and September 2, 2008, the Court conducted an evidentiary hearing on

_____

[3]This Policy provides that: "The use of corporal punishment . . . is absolutely prohibited by an employee of the Department of Correction."  It goes on to define corporal punishment to include "violence of any nature; *the use of profane or abusive language . . . directed toward the inmate*; or any measure which may be injurious to an individual."  *See* PX #9 (emphasis added).

[4]The Prison Litigation Report Act ("PLRA") requires a prisoner to fully exhaust his administrative remedies *before* he can properly file a § 1983 action in federal court.  *See* 42 U.S.C. § 1997e(a).  Filing an informal resolution is the *first step* an ADC prisoner must take in order to fully exhaust his administrative remedies.  Thus, it is an essential part of what a prisoner must do in order to exercise his constitutionally protected right to "access the courts."

[5]Importantly, the allegation that Defendant Stephenson cursed and threatened Plaintiff, in violation of ADC policy, is a claim that does *not* rise to the level of constitutional dimension under § 1983.  *See McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993).  However, it is well settled that prison officials cannot "impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right."  *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007).  To establish a *prima facia case* of retaliatory discipline, an inmate must show that: "(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline."  *Id.*

the merits of Plaintiff's claim against Defendant Stephenson. Plaintiff appeared *pro se*. Defendant Stephenson was represented by attorneys from the Arkansas Attorney General's Office.

The Court heard testimony from Plaintiff and three of his witnesses: Thomas Stephens, David Ferrell, and Kenneth Novak, all of whom were prisoners in TMSU, in June and July of 2007. During the presentation of Defendant's case, the Court heard testimony from Sgt. Stephenson; Lt. L. C. Sipes, an officer at TMSU at the time Defendant Stephenson wrote the June 27 disciplinary; Minnie Drayer, the Disciplinary Hearing Officer ("DHO") who dismissed the June 27 disciplinary; Randall Manus, the Deputy Warden at TMSU when Plaintiff received the June 27 disciplinary; and Larry May, the Assistant Director of the ADC, who affirmed Ms. Drayer's decision to dismiss the June 27 disciplinary and found Plaintiff's grievance, challenging that disciplinary on the ground it was retaliatory, "*has merit.*"

During the evidentiary hearing, the Court received into evidence: (1) Plaintiff's Exhibits 1 through 18; and (2) Defendant's Exhibits 1 through 20. Defendant's counsel stipulated, on the record, to the admissibility of all of Plaintiff's Exhibits, and Plaintiff stipulated, on the record, to the admissibility of Defendant's Exhibits 1 through 19. Because there is considerable duplication among the parties' respective Exhibits, the Court will refer to the Exhibits which are duplicative using only Defendant's exhibit numbers. Plaintiff's Exhibits will be referred to as "PX #____" and Defendant's Exhibits will be referred to as "DX #____."

After carefully considering all of the testimony and Exhibits, the Court makes the following recommended disposition.

## II. Findings of Fact and Conclusions of Law

**A.  The June 22, 2007 Incident Between Plaintiff And Defendant Stephenson**

1.  At approximately 8:40 a.m. on June 22, 2007, Plaintiff was standing in one of the main hallways of TMSU, near the captain's office and the pill call window, talking with Lt. Sipes. Both Plaintiff and Lt. Sipes testified that, after visiting with each other for several minutes, Defendant Stephenson walked up.  According to Plaintiff, Defendant Stephenson was always trying to get into "prisoners' business," and Plaintiff thought he was trying to eavesdrop on his conversation with Lt. Sipes.  According to Plaintiff, he asked Lt. Sipes if he needed Defendant Stephenson to be part of their conversation.  According to Defendant Stephenson, Plaintiff asked Lt. Sipes if Defendant Stephenson was standing there because Lt. Sipes "needed a bodyguard."  Regardless of whose recollection is correct on what Plaintiff said to Lt. Sipes, Defendant Stephenson unequivocally testified that he took Plaintiff's statement to be *disrespectful* and a *direct challenge* to his authority.

2.  Immediately after Plaintiff made this remark, Defendant Stephenson told Lt. Sipes that he had a phone call in the captain's office, which was located approximately twenty feet away. As soon as Lt. Sipes went inside the office, Defendant Stephenson got close to Plaintiff and, in a loud voice, told him not to ever again say anything to or about him to anyone else.  According to Defendant Stephenson: "I never cursed, if you call 'hell' a curse word, yeah, then I cursed him [Plaintiff] if 'hell' is a curse word."  He also flatly denied making any threats against Plaintiff.

3.  Defendant Stephenson admitted that he took Plaintiff's "sarcastic remark" to Lt. Sipes as a challenge to his authority, and he believed it justified him making a strong verbal response to Plaintiff to ensure that he did not do it again.  Defendant Stephenson testified that he got within "about eighteen inches" of Plaintiff and explained to him, without using *any profanity*, that, as a

guard, he could stand anywhere he wanted in the hall and it was not Plaintiff's role, as an inmate, to make disrespectful or sarcastic comments about him to other guards.

4.      Plaintiff testified to a much different version of what happened during this incident. According to Plaintiff, Defendant Stephenson liberally used the "F" word, while admonishing him for his remark to Lt. Sipes, and poked him in the chest with his finger at least once.  Plaintiff stated that Defendant Stephenson concluded his profanity laced tirade by telling him that, if he ever again made a similarly disrespectful statement, "he [Plaintiff] would live to forget it."[6] Plaintiff construed this threat to mean that Defendant Stephenson would make so much trouble for him that it would cause him to remain in the ADC until he flattened his forty-year sentence.

5.      Lt. Sipes testified that he did *not* hear anything that was said between Plaintiff and Defendant Stephenson after he left to take the phone call in the captain's office.  The Court finds Lt. Sipes's testimony to be credible, since he was more than twenty feet away from the incident, inside an office, talking on the phone with someone in the classification section.  Even if Defendant Stephenson had uttered the alleged profanity and threat in a loud voice, the Court finds it unlikely that Lt. Sipes would have heard it while engaged in a telephone conversation inside an office.

_____

[6]In Plaintiff's June 22, 2007 informal resolution, he accused Defendant Stephenson of the following specific misconduct: "I was in the hallway at count time speaking to Lt. Sipes . . . when Sgt. Stephenson came up and was listening to our conversation.  I then asked Lt. Sipes if this man was needed in our conversation and he said no.  Then Lt. Sipes was called away into the classification office.  Sgt. Stephenson then approached me in a threatening manner and stated: 'I don't ever need you to ask anything or any fucking one about something concerning me.  I don't need you saying any fucking thing to me or fucking about me to any S.O.B.'  Then he put his finger in my face and said 'if you ever do, I swear you'll live to fucking forget it.' " *See* DX #1.

During his testimony, Plaintiff explained the June 22 incident in essentially these same terms. The only substantive difference was that, instead of Defendant Stephenson allegedly putting "his finger in my face," he testified that Defendant Stephenson poked him once in his chest with his finger.

6.	According to Defendant Stephenson, there were *no witnesses* to the exchange that took place between him and Plaintiff.  According to Plaintiff, Thomas Stephens, who had a cell next to Plaintiff's in Barracks 3, was at the pill call window and witnessed and overheard the incident.

7.	Stephens testified that, at approximately 8:45 a.m. on June 22, 2007, he was at the pill call window and observed the incident.  Counsel for Defendant Stephenson asked Stephens why the inmate "Count Log" for the morning of June 22, 2007, did not reflect that he was allowed to leave his cell to go to "pill call."  *See* DX #19.  According to Stephens, TMSU guards often failed to note the name of inmates who are released to go to pill call.  Thus, he was not surprised his name did not appear on the "Count Log."  Importantly, the "Count Log" reflects that *no prisoners* went to pill call from 6:00 a.m. to 2:00 p.m. on June 22.  The Court finds this supports Stephens's testimony that the guards may have failed to note the names of inmates who were released to pill call on the morning of June 22.

8.	According to Stephens, he saw Defendant Stephenson "get into Plaintiff's face" and heard him curse Plaintiff in a loud and threatening voice.  When asked the specific curse words Defendant Stephenson used, Stephens said such words "all kind of sound the same" to him.  When asked if he could recall the specific threat Defendant Stephenson made,  Stephens testified that Defendant Stephenson threatened to "whip his [Plaintiff's] ass."

9.	Stephens's recollection of Defendant Stephenson's alleged threat is at odds with both Plaintiff's testimony and the threat that is described in the June 23, 2007 informal resolution, which was written only a short time after the June 22 incident.  While Stephens may have witnessed the June 22, 2007 incident, the Court finds what little he recalls hearing to be of no evidentiary value.  Thus, in deciding what actually took place during the June 22 incident, the Court must make a

credibility determination based on the testimony of Plaintiff and Defendant Stephenson.

10.      Plaintiff testified that, a number of years earlier, when he was incarcerated at the Tucker Unit, he had some problems with Defendant Stephenson.  However, prior to the June 22 incident, Defendant Stephenson had never written a disciplinary on Plaintiff.  Plaintiff also testified that Defendant Stephenson was always doing things to aggravate inmates at TMSU, and this caused him to be widely disliked.

11.      The last sentence of Plaintiff's June 23 informal resolution states the following:  "I've noticed at several times that this officer has cursed other inmates in an abusive manner and this is why I am filing this resolution because this guy needs to be stopped."  *See* DX #1.  David Ferrell, one of Plaintiff's witnesses, explained that almost all of the inmates at TMSU are doing lengthy sentences, and, with only a few exceptions, the guards respected the inmates and left them alone. According to Ferrell, Defendant Stephenson was one of those "exceptions."  Stephens also testified that Defendant Stephenson frequently cursed and antagonized inmates at TMSU.

12.      During Stephens's testimony, he began to describe a "similar incident" that he was involved in with Defendant Stephenson, which took place a few weeks before the June 22 incident. The Court ruled that Stephens could not testify about this earlier incident because it was inadmissible under Rule 404(b) of the Federal Rules of Evidence.[7]

13.      During Defendant Stephenson's direct testimony, one of his attorneys asked him to

---

[7]In making this ruling, the Court assumed that Plaintiff was seeking to introduce Stephens's testimony to prove that, because Defendant Stephenson had previously cursed and threatened Stephens, this made it more likely that he also cursed and threatened Plaintiff on June 22, 2007. Such evidence clearly is not admissible under Rule 404(b).

describe what happened during the incident he was involved in with Stephens on May 11, 2007.[8]

According to Defendant Stephenson, as he walked by Stephens in the hallway, he said something to Defendant Stephenson that was disrespectful. Defendant Stephenson admitted that he became very angry and cursed and threatened Stephens in a loud and belligerent manner.[9] Importantly, a number of other correction officers witnessed this incident. One of those officers, Lt. Sipes, took Defendant Stephenson inside the captain's office and admonished him for engaging in such unprofessional conduct, which was a clear violation of ADC policy.

---

[8]Thus, Defendant Stephenson voluntarily "opened the door" to the admissibility of testimony concerning the May 11 incident with Stephens.

Plaintiff sought to introduce the Final Report of an ADC Internal Affairs Investigator. Among other things, the Final Report addressed whether Defendant Stephenson had used physical force against inmate Stephens during the May 11 incident. *See* PX #18. In response to questions from his own lawyer, Defendant Stephenson admitted that Warden White later ordered an internal investigation of the May 11, 2007 incident.

The Court ruled this exhibit was admissible under Rule 404(b) because it contained evidence of Defendant Stephenson's potentially retaliatory motive for filing the June 27 disciplinary. Defendant Stephenson's attorneys objected on the ground that Rule 404(b) was only applicable in criminal cases. The Court overruled this objection because Rule 404(b) "applies in both civil and criminal cases[.]" *See Huddleston v. United States*, 485 U.S. 681, 685 (1988). While Rule 404(b) does contain a notice requirement specific to criminal cases, the official note to the 2006 amendments to Rule 404 explains that 404(b) also applies to civil cases:

> Nothing in the amendment is intended to affect the scope of Rule 404(b). While Rule 404(b) refers to the "accused," the "prosecution," and a "criminal case," it does so only in the context of a notice requirement. The admissibility standards of Rule 404(b) remain fully applicable to both civil and criminal cases.

[9]Stephens was interviewed by the Internal Affairs Investigator who prepared the Final Report on the May 11 incident. Stephens told the investigator that Defendant Stephenson "went completely crazy" and "tossed his I.D. badge on the floor, said the hell with this job and said for me [Stephens] to shut my bitch, punk, fucking ass up, you fucking coward or I'll beat your white punk ass up." PX 18 at 2. Defendant Stephenson *admitted* to the Internal Affairs Investigator that he "cussed out Inmate Stephens, and that he may have pointed his finger at Inmate Stephens and physically threatened him, but that he did not physically assault Inmate Stephens." *Id.* at 5. In his interview with the Internal Affairs Investigator, Lt. Sipes confirmed that Defendant Stephenson threatened to "beat his [Stephens's] ass and threw his [Stephenson's] badge on the floor." *Id.*

14.     During his interview with the Internal Affairs Investigator, Defendant Stephenson *admitted* that he cursed and threatened Stephens and otherwise engaged in unprofessional conduct.[10] Nevertheless, Defendant Stephenson believed that the Court should consider the May 11 incident as evidence that, when he does something wrong, he "admits to it" and does not try to lie about it. In other words, Defendant Stephenson believed that the May 11 incident with Stephens proved that, *if* he had cursed and threatened Plaintiff on June 22, he simply would have admitted to the misconduct, rather than file a false and retaliatory disciplinary against Plaintiff.

15.     Warden White formally reprimanded Defendant Stephenson for his misconduct in the May 11 incident and ordered him to take a one-week course in anger management. Mr. Manus testified that anger management training was only ordered for guards who appeared to have a problem controlling their tempers.[11]

16.     According to Defendant Stephenson, shortly *before* the June 22, 2007 incident, he

_____

[10]Interestingly, Warden White wrote the Internal Affairs Administrator a letter, which was received on September 7, 2007, requesting an investigation of inmate Stephens's charge that, during the May 11 incident, Defendant Stephenson had physically abused him. Of course, in Inmate Stephens's informal resolution and grievance, he also accused Defendant Stephenson of using profanity and threatening to beat his "white punk ass up." *See* PX #18 at 2. Thus, the investigation explored all of Stephens's allegations against Defendant Stephenson.

On September 6, 2007, the day before Warden White sent his letter to the Internal Affairs Administrator, he *denied* inmate Stephens's May 12 grievance because "no evidence has been found nor have you provided any evidence to substantiate your allegation against staff." *See* PX #18 at 4. According to the Final Report on this incident, Defendant Stephenson admitted to the Internal Affairs Investigator that he had used profanity against inmate Stephens and also threatened to physically harm him. To this extent, the Final Report reflects that Warden White was incorrect in denying those aspects of inmate Stephens's May 12 grievance. However, to the extent the Final Report found that Defendant Stephenson had not physically abused inmate Stephens, that allegation in the grievance was resolved in favor of Defendant Stephenson.

[11]The Court asked Mr. Manus if Warden White had required Defendant Stephenson to undergo anger management counseling because "he had a sufficient problem controlling his temper and his anger that he needed [it] . . . ." Mr. Manus replied "Yes."

took the one-week course in anger management, which was taught by a male and a female instructor who came to TMSU. He received five days of classroom instruction, which covered written course material and training videos. Defendant Stephenson testified that what he learned during anger management training helped him *not* to curse during the June 22 incident with Plaintiff.

17.     This testimony is *in direct conflict* with what Defendant Stephenson told the Internal Affairs Investigator during the interview that took place on December 19, 2007. At that time, Defendant Stephenson told the investigator that "*he would be scheduled for a future class in anger management*, which was also confirmed in my phone conversation with Warden White on 12-21-07." *See* PX #18 at 6 (emphasis added). The Court finds Defendant Stephenson was either badly confused or lying when he testified that he received this anger management training *before* the June 22 incident.

18.     During the December 19, 2007 interview with Defendant Stephenson, the Internal Affairs Investigator asked him why he had not filed disciplinaries against inmate Stephens for his alleged previous use of disrespectful language toward him. Defendant Stephenson gave the following response: "[M]ost of the guys you write up nowadays find some kind of way to beat the disciplinary, so he [Stephenson] just soon [sic] cuss them, so he gets his point across and they get an understanding then it's done and over with." *See* PX #18 at 5. This statement by Defendant Stephenson manifests a total disregard for the ADC's policy on corporal punishment, which explicitly *prohibits* a guard from directing profanity at an inmate. To the extent Defendant Stephenson admitted during the December 19, 2007 interview that he *preferred using profanity to get his point across to inmates*, his testimony that he did not use profanity during the June 22 incident with Plaintiff seems extremely implausible.

19.    During his direct testimony, the Court and Defendant Stephenson had the following colloquy regarding whether he used some form of the "F" word during the June 22 incident:

The Court:     You're sure –

The Witness:  Yeah.

The Court:     During the course of doing that [explaining to Plaintiff he should not make sarcastic or disrespectful remarks about Stephenson] --

The Witness:  Yes, sir.

The Court:     --that you wouldn't have used the F word?

The Witness:  I'm quite sure.

The Court:     Is that a word you use a lot?

The Witness:  No.

The Court:     You're under oath.  Is that a word that you use on a regular basis during your work at the maximum security unit?

The Witness:  No.  No, sir.  If he [referring to Plaintiff] would have said I said mother------- something like that, then maybe that would have slipped out, but I don't –

The Court:      So MF is a word you do use?

The Witness:  Yeah.

The Court:     But you don't usually use the F word?

The Witness:  No, no, no.

The Court:     So if he [Plaintiff] said you called him a MF–

The Witness:  It might have been a point.

The Court:     But just using the F word –

The Witness:  No, . . .  After that Stephens incident I've been trying . . . to clean up my language and . . . I don't get down like that anymore.  I'd just as soon just write the disciplinary and let them go on.

20.    In essence, Defendant Stephenson testified, with a straight face, that he *did* use MF but he did *not* use the F word to get his point across to prisoners.  The Court finds this testimony to be utterly unbelievable.  After all, Defendant Stephenson admitted to the Internal Affairs Investigator that: (a) he had cursed Stephens during the May 11 incident;[12] and (b) he preferred "cussing" inmates, instead of writing them up for disciplinaries.  *See* PX #18 at 4-5.  Viewed in this context, the above-quoted testimony by Defendant Stephenson comes dangerously close to outright perjury.

21.    Finally, Defendant Stephenson testified to at least three things that other defense witnesses *denied* ever took place:

First, Defendant Stephenson said that, just before the evidentiary hearing began on August 27, Mr. May, the Assistant Director of the ADC, explained to him (while they were seated in the back of the courtroom) that he should have gotten "the assistant warden" at TMSU or a "grievance officer" to write the June 27 disciplinary against Plaintiff.  During his testimony, Mr. May *flatly denied* even having any such discussion with Defendant Stephenson.

Second, Defendant Stephenson said that, in late 2006 or early 2007, Assistant Warden Manus told him that, anytime a prisoner makes what the guard believes is

_____

[12]In his Final Report on the May 11 incident, the Internal Affairs Investigator quotes from Inmate Stephens's informal resolution which specifically accuses Defendant Stephenson of using the F word twice.  In his interview with the Internal Affairs Investigator, Defendant Stephenson admitted cursing Stephens and did not deny that he used the F word as alleged by Stephens.  The Court views this as evidence that Defendant Stephenson in fact used the F word as alleged by Inmate Stephens in the informal resolution and grievance.

a false statement in an informal resolution or grievance, the guard has the authority

to issue a disciplinary to the prisoner:

> The Court: He [Mr. Manus] just said, you've got the authority to do it?
>
> The Witness: Yes. And then after all of this [Plaintiff's lawsuit] – then he said that yeah, you can write it, but you need to have someone else that's seen it . . . write a statement to support what you said.
>
> The Court: But your testimony when he [Mr. Manus] originally explained this to you, he left that out?
>
> The Witness: Right.
>
> The Court: He [Mr. Manus] didn't tell you that part?
>
> The Witness: Right.

During his testimony, Mr. Manus *denied* even telling Defendant Stephenson, in late

2006 or thereafter, that a guard had the authority to issue a disciplinary to a prisoner

any time the guard believed the prisoner had made false statements in an informal

resolution or grievance.

Third, Defendant Stephenson claimed that, a day or two after he wrote the

June 27 disciplinary but before the July 2 disciplinary hearing, he saw DHO Drayer

and asked her: "Can you [a guard] or can you not write a disciplinary on a

grievance?" According to Defendant Stephenson, DHO Drayer responded that: "She

wasn't sure, but she said she could ask Ms. Amy Compton . . . ." During her

testimony, Ms. Drayer *denied* ever seeing or talking to Defendant Stephenson before

the July 2 disciplinary hearing:

> The Court: And if Mr. Stephenson had testified that he had a

> conversation with you sometime before the disciplinary, a few days before the disciplinary hearing [on July 2] in which he asked whether or not he had the authority to write that disciplinary, would that be true or false?

> The Witness: I would say that would be false.

Thus, three of Defendant Stephenson's *own witnesses* testified that he was *not* truthful about conversations he purportedly had with them concerning his alleged authority to issue the June 27 disciplinary to Plaintiff.

22. In testifying about the June 22 incident, the Court finds Plaintiff's testimony to be sincere and credible. In contrast, Defendant Stephenson's testimony emitted the "powerful . . . odor of mendacity."[13] Thus, the Court finds that Defendant Stephenson did use the profanity described by Plaintiff during the June 22 incident and that he verbally threatened Plaintiff by telling him that, if he ever made another sarcastic or disrespectful remark to or about him, "he would live to fucking forget it."

**B.      Plaintiff's June 23, 2007 Informal Resolution**

1. Plaintiff completed the seventh grade in school and has a very limited ability to read and write. Therefore, he asked other inmates to write the informal resolutions and grievances raising the claim that he is now asserting against Defendant Stephenson. However, Plaintiff made it clear that he signed and dated all of those documents and that he told the scrivener inmates what to write in those informal resolutions or grievances.[14]

---

[13]Tennessee Williams, *Cat on a Hot Tin Roof*.

[14]Inmate Stephens testified that he was the scrivener for the June 23 informal resolution (DX #1); the Inmate Appeal of Warden White's denial of the June 28, 2007 grievance (DX #3); the July 3, 2007 informal resolution charging Defendant Stephenson with filing a retaliatory disciplinary

2.      On June 23, 2007, Plaintiff filed the informal resolution accusing Defendant Stephenson of cursing and threatening him.  *See* DX #1.  In pertinent part, that document states the following:

> After Lt. Sipes was called away into the classification office, Sgt. Stephenson then approached me in a threatening manner and stated "I don't ever need you to ask anything or any fucking one about something concerning me.  I don't need you saying any fucking thing to me or fucking about me to any SOB."  Then he put his finger in my face and said "If you ever do, I swear you'll live to fucking forget it."

*Id.*

3.      On the morning of June 27, 2007, Sgt. Lyons began her investigation of the allegations contained in the June 23 informal resolution.[15]  She met with Defendant Stephenson, showed him the informal resolution, and asked him for his version of the incident.  According to her notes at the bottom of the informal resolution, Defendant Stephenson told her "at no particular time did he threaten or use profanity to you [referring to Plaintiff]."  *See* DX #1.

4.      Defendant Stephenson testified that he found out that Plaintiff had filed the June 23 informal resolution during his meeting with Sgt. Lyons the morning of June 27.  Thus, he knew his alleged conduct during the June 22 incident would eventually come to the attention of Assistant Warden Manus or Warden White, one of whom was required to review all grievances as part of the grievance appeal process.

---

(DX #5); the July 12, 2007 grievance charging Defendant Stephenson with filing a retaliatory disciplinary (DX #6); and the Inmate Appeal of Assistant Warden Manus's denial of the July 12, 2007 grievance (DX #7).  Inmate Ferrell testified that he was the scrivener for the June 28, 2007 grievance (DX #2).

[15]Sgt. Lyons was the "grievance officer" assigned to investigate the June 23 informal resolution.

**C.      Defendant Stephenson's Motivation For Filing The June 27, 2007 Disciplinary Against Plaintiff**

1.      The Court finds that the almost identical incident between Defendant Stephenson and Stephens, on May 11, 2007, is directly relevant to determining Defendant Stephenson's *motivation* for filing the June 27, 2007 disciplinary against Plaintiff.  As the Final Report on the May 11 incident makes clear, fellow guards at TMSU, including Lt. Sipes, witnessed Defendant Stephenson's behavior.  Once Warden White ordered an internal investigation of the incident, it would have been futile for Defendant Stephenson to lie about his misconduct.  Thus, Defendant Stephenson had *no choice* but to be truthful about the May 11 incident.

2.      In contrast, in this case, no one saw or heard what happened during the June 22 incident.  Thus, Defendant Stephenson knew that the ultimate resolution of the allegations in Plaintiff's June 23 informal resolution would come down to a "swearing contest" between himself and Plaintiff.  This created the possibility that Defendant Stephenson *might* get away with lying about his use of profanity and threats during the June 22 incident with Plaintiff.

3.      Finally, Defendant Stephenson had a powerful motivation to deny using profanity and making a threat during the June 22 incident.  Having engaged in essentially the *same misbehavior* with inmate Stephens on May 11, Defendant Stephenson knew that Warden White might suspend him from his job or fire him if he found out what really happened.[16]  This certainly provided

---

[16]Defendant Stephenson testified that, *if* he had in fact cursed and threatened Plaintiff as alleged in the June 23 informal resolution, he believed Warden White would have punished him by suspending him from his job.  Based on his understanding of the ADC disciplinary process for guards, Defendant Stephenson did not believe it would have resulted in his termination.  Assistant Warden Manus testified that, if Defendant Stephenson had admitted to the charges contained in Plaintiff's June 23 informal resolution, he believed Warden White would have either suspended Defendant Stephenson or terminated him.

Defendant Stephenson with a strong motive for filing a retaliatory disciplinary against Plaintiff to get back at him for filing an informal resolution which might cost him his job. In addition, it placed Defendant Stephenson in a stronger position to defend himself against the charges in the informal resolution by claiming that he took the highly unusual step of filing the disciplinary against Plaintiff because the allegation in the June 23 informal resolution was so utterly false.

4.     At 8:15 a.m. on June 27, 2007, almost immediately after Sgt. Lyons advised Defendant Stephenson that Plaintiff had filed the June 23 informal resolution, Defendant Stephenson filed a disciplinary against Plaintiff. *See* DX #11. In the Notice of Charges, Defendant Stephenson makes it clear why he is filing the disciplinary:

> On the above date and approximate time [06/27/2007 08:15 a.m.] I Sgt. Stephenson received an informal resolution from inmate W. Haynes #111110 stating that I (Sgt. Stephenson) "approached him in a threatening manner and stated I don't ever need you to ask anything or any fucking one about something concerning me. I don't need you saying any fucking thing to me or fucking about me to any SOB." *I Sgt. Stephenson never said this so therefore I am charging inmate W. Haynes with the following rules violations 12-1, 13-1.*

*Id.* (emphasis added).

5.     Rules 12-1 and 13-1 of the ADC "Behavior Rules and Regulations" provide the following:

> (a)     12-1. Failure to obey verbal and/or written orders of staff.
>
> (b)     13-1. Deliberately giving information or falsely accusing another in the course of an official investigation.

*See* DX #15 at 7. According to Defendant Stephenson, a violation of 12-1 *automatically occurs* in every disciplinary which charges an inmate with violating another provision of the "Behavior Rules and Regulations." In other words, because Plaintiff allegedly violated Rule 13-1 (which is a written

rule) by making a deliberately false allegation in his June 23 informal resolution, he also violated

Rule 12-1, which prohibits an inmate from disobeying any written rule.

6.      Section J of the ADC's grievance procedure prohibits an inmate from "abusing the

grievance procedure."  Paragraph 4 of Section J provides the following:

> Any inmate who knowingly makes false statements to staff for the purpose of harming another person may be charged with the appropriate disciplinary offense.

*See* DX #17 at 11.

7.      Section K of the ADC's grievance procedure goes on to explicitly prohibit any form

of "reprisal" against an inmate for exercising his right to file an informal resolution or grievance.

Among other things, Section K makes it clear that ADC staff is "absolutely prohibited" from

retaliating against an inmate for making appropriate use of the grievance procedure:

> 1.      *No inmate shall suffer any action or threat of action based on his or her appropriate use of or participation in the grievance procedure. . . .  Such behavior on the part of staff is absolutely prohibited* and will be dealt with in accordance with the appropriate policy regarding employee conduct and discipline.

> 2.      *In addition to the initial and periodic training of department personnel in the grievance procedures, all personnel shall receive written and oral notice that formal and/or informal reprisals will not be tolerated.*

> The Training Academy will implement a training program regarding inmate problem resolutions and complaints.  The training shall be mandatory for all staff involved in the inmate grievance process.

> 3.      *Once an inmate initiates the grievance process* [by filing an informal resolution], *the process shall be followed through all stages without interference by administrators or employees of the department.*

-18-

*See* DX #17 at 12 (emphasis added).

8.      Mr. May testified that he is responsible for overseeing the ADC's prisoner grievance procedures at five ADC units, including TMSU.  He candidly admitted that the ambiguous language in ¶ 4 of Section J could be *erroneously construed* to mean that, if a prisoner wrote an informal resolution or grievance that contained false statements about a guard, the guard  could write a disciplinary against the prisoner for making false statements in an informal resolution or grievance. Because such a disciplinary, on its face, would have the strong appearance of being retaliatory, Mr. May testified that this paragraph was *never intended* to allow or authorize a guard to write such a disciplinary.

9.      According to Mr. May, sometime in early 2006, he had a meeting with all of the Wardens of all units of the ADC to explain to them how ¶ 4 of Section J should be properly applied in the narrow range of cases that justified a prisoner receiving a disciplinary for making a false statement in an informal resolution or grievance.  According to Mr. May, this is what he verbally told the Wardens:

(a)      If a guard believed a prisoner had made a false statement against him or her in an informal resolution or grievance, the guard should prepare a 005 report of the incident.

(b)      The guard should then take the 005 incident report to the Chief Security Officer ("CSO") or Warden of the unit and request that the CSO or Warden make an *independent review* of the incident to determine if a disciplinary should be filed against the prisoner.

-19-

(c)      If the CSO or Warden concluded there was a sufficiently strong case for proving that the inmate has made objectively false statements about the guard, then the *CSO* or *Warden* could file a disciplinary against the inmate, which would be supported by statements from the guard *and* other witnesses corroborating that the prisoner's statements were objectively false.

Mr. May testified that he directed the Wardens to instruct their Assistant Wardens and all guards at their units on the proper meaning of ¶ 4 of Section J and the narrow range of cases in which it authorized a disciplinary to be issued against an inmate for making false statements in an informal resolution or grievance.

10.      Mr. Manus, the Deputy Warden at TMSU, testified that no Warden or other supervisor ever explained to him how ¶ 4 of Section J should be construed.  According to Mr. Manus, *he* interpreted that paragraph to mean that *a guard could file a disciplinary against a prisoner*, for making what the guard believed to be a false statement in an informal resolution or grievance, *if* the incident was witnessed by other guards who could provide *corroborating statements* or videotaped evidence to prove that the prisoner's statements were false.  According to Mr. Manus, the need for this corroborating evidence was necessary to offset the otherwise strong appearance that such a disciplinary was retaliatory.

11.      Ms. Drayer, the DHO who ultimately dismissed Defendant Stephenson's June 27 disciplinary against Plaintiff, testified that she had still another understanding of the meaning of ¶ 4 of Section J.  Ms. Drayer stated that "it's my understanding that on a grievance process, that if an inmate writes up a grievance on a staff member, that the staff member cannot write a disciplinary

on the grievance, because it would appear like it was retaliatory." According to Ms. Drayer, if a prisoner makes a false statement in an informal resolution or grievance, and the *grievance officer* who conducts the investigation of that grievance determines that the statements by the prisoner are false, then the *grievance officer* can file a disciplinary against the prisoner for making false statements in the informal resolution or grievance.

12.     Defendant Stephenson testified that he began working as a guard for the ADC in 2000. Within one or two years after becoming a guard, he learned that he could *not* write a disciplinary based on an inmate making a false statement in an informal resolution or grievance. This was based on his understanding that, if such a disciplinary were issued, it would appear to be retaliatory. Defendant Stephenson admitted that, during the eight years he has been a guard at the ADC, the June 27 disciplinary was the *first and only disciplinary* he ever wrote charging an inmate with allegedly making a false statement about him in an informal resolution or grievance.

13.     Lt. Sipes signed the 005 incident report prepared by Defendant Stephenson. *See* DX #9. Lt. Sipes testified that, during his more than twenty years of working at the ADC, he has signed off on hundreds of 005 incident reports prepared by guards as the first step in issuing a disciplinary to a prisoner. According to Lt. Sipes, this was the *first and only time in his career* that a guard ever attempted to file a disciplinary against an inmate for making allegedly false statements in an informal resolution or grievance. Mr. May, another long-time employee of the ADC, testified that it was "extremely rare" for such a disciplinary to be issued and he could only recall possibly seeing one or two such disciplinaries during his career.

14.     At the time Defendant Stephenson issued the June 27 disciplinary, he testified that he *knew* Plaintiff had a constitutional right to file the informal resolution as the first step in accessing

the courts:

> The Court: Did anyone ever in training explain to you that a prisoner has a constitutional right to file an informal resolution because it's the first step in his access to the courts?
>
> The Witness: Yes, I understand that. I understand it totally.
>
> The Court: You understand that now, or your understood it then?
>
> The Witness: I understood it then. I know they have to go through those processes to get where they need to be.

15.     On the first day of the evidentiary hearing, Defendant Stephenson testified that, *sometime in late 2006*, about six months *before* the June 22 incident with Plaintiff, he talked to Mr. Manus about a recent incident in which a TMSU prisoner had filed an informal resolution that falsely accused Defendant Stephenson of fondling the prisoner's buttocks. According to Defendant Stephenson, Mr. Manus told him that he should have filed a disciplinary against the inmate for making a false statement in an informal resolution. Defendant Stephenson took this to mean that, *anytime* a prisoner made a statement in an informal resolution or grievance that a guard believed was false, the guard had the authority to file a disciplinary against the prisoner. Defendant Stephenson was unable to explain why he so readily accepted Mr. Manus's opinion on this subject since it was in *direct conflict* with Defendant Stephenson's long-time understanding that, *under no circumstances*, was a guard ever authorized to file a disciplinary against a prisoner for making false statements in an informal resolution or grievance.

16.     During Mr. Manus's testimony, on September 2, he confirmed that, *sometime in 2006*, Defendant Stephenson talked with him about a false grievance a prisoner had filed accusing Defendant Stephenson of touching his buttock. According to Mr. Manus, he told Defendant

Stephenson that, *if* he had *corroborating statements* from other guards or videotaped evidence of the incident, he could file a disciplinary against the inmate for making false statements in an informal resolution or grievance. Mr. Manus denied ever telling Defendant Stephenson that a guard could file a disciplinary anytime an inmate made what the guard believed to be false statements in an informal resolution or grievance. However, Mr. Manus's testimony provided at least some support for the idea that perhaps Defendant Stephenson "mistakenly" thought that he had the authority to issue the June 27 disciplinary against Plaintiff.

17.     Later in his testimony, Mr. Manus volunteered that he was transferred to TMSU in April or May of 2007, only a short time before the June 22 incident. The Court asked Mr. Manus to explain his earlier testimony that, *sometime in late 2006*, he had the alleged discussion with Defendant Stephenson about his authority to issue a disciplinary to an inmate for allegedly making a false statement in an informal resolution or grievance. Mr. Manus immediately changed his earlier testimony and said this conversation with Defendant Stephenson took place in April or May of *2007*. Of course, this in no way explained why Defendant Stephenson recalled this conversation taking place in 2006 or why Mr. Manus failed to recall that such an important conversation allegedly took place only perhaps weeks or, at most, two months before the June 22 incident. The discrepancy over when this alleged conversation took place causes the Court to have doubts about whether it took place at all.

18.     Finally, during his August 27 testimony, Defendant Stephenson stated that, during the deposition of Plaintiff a few weeks before the August 27, 2008 evidentiary hearing, he talked with Mr. Manus about the steps he should have taken in issuing Plaintiff the June 27 disciplinary. According to Defendant Stephenson, Mr. Manus told him that he had misunderstood their earlier

conversation in 2006 and then explained the proper way the disciplinary should have been issued.

19.     When Mr. Manus testified on September 2, the Court asked him if he had talked with Defendant Stephenson in the last few weeks about the proper steps he should have taken in writing the June 27 disciplinary.  Mr. Manus *denied* having any discussions with Defendant Stephenson about this subject prior to the beginning of the evidentiary hearing on August 27.  However, Mr. Manus volunteered that, *after* the Court adjourned the evidentiary hearing on August 27, he rode back to TMSU with Defendant Stephenson and they discussed "the proper way" that Defendant Stephenson should have gone about filing the disciplinary against Plaintiff.

20.     At the beginning of the evidentiary hearing on August 27, the Court *sua sponte* invoked Rule 615 of the Federal Rules of Evidence.  Mr. Manus and the other non-party witnesses were instructed that they must now leave the courtroom and *not* discuss any of the facts involved in the case or their upcoming testimony *with anyone* until they were called to the stand to testify.  The Court also explained to them that the purpose of Rule 615 was to discourage witnesses from fabricating testimony or colluding with each other to ensure that their testimony would be consistent.[17]  In light of those instructions, the Court asked Mr. Manus why he had talked with Defendant Stephenson about the facts of the case during their drive from Little Rock to TMSU.  According to Mr. Manus, he did not believe that his conversation with Defendant Stephenson, about one of the most important aspects of this case, violated those instructions.[18]

---

[17]It appears that all of the non-party witnesses except Mr. Manus understood these instructions and did not discuss the facts involved in the case or their testimony with anyone before they were called to the stand to testify.

[18]During the evidentiary hearing, the Court and Mr. Manus had the following colloquy on this subject:

21.     The Court finds the discussions that took place between Defendant Stephenson and Mr. Manus, on their more than one hour drive back to TMSU, were a clear violation of Rule 615 and the Court's explicit instructions to the witnesses.  The Court further finds that Mr. Manus knew, from those instructions, that he was prohibited from having those discussions with Defendant Stephenson.

22.     Based on Mr. Manus's revelation that he and Defendant Stephenson talked about the case, after court adjourned on August 27, the Court makes the following findings:

(a)     Mr. Manus's and Defendant Stephenson's testimony regarding the alleged conversation they had about his authority to issue a disciplinary to a prisoner for making false statements in an informal

---

| The Court: | I instructed everyone in this courtroom that they weren't to discuss any of the facts in this case until they were called to the stand to testify.  You remember that instruction that I gave? |
| --- | --- |
| Mr. Manus: | Yes sir, I remember that. |
| The Court: | Explain to me then why you were talking Wednesday afternoon with Defendant Stephenson about this case. |
| Mr. Manus: | We were riding home together . . . . |
| The Court: | . . . Mr. Manus, I'm having a real problem with . . . your engaging in a discussion about the facts in this case with Defendant Stephenson [on the drive back to TMSU]. |
| Mr. Manus: | I didn't remember discussing facts with him about testimony, sir. |
| The Court: | You talked to him about the policy that relates to the disciplinary which is the very heart of the claim that's been brought against him, Mr. Manus.  That's the heart of what this lawsuit is about. |
| Mr. Manus: | Okay. |

resolution or grievance has the strong appearance of being "contrived."

(b)     Mr. Manus appears to have crafted his testimony, based on what he learned during his conversation with Defendant Stephenson on the drive back to TMSU, to support Defendant Stephenson's testimony that he "mistakenly believed" he had the authority to write the June 27 disciplinary.

(c)     Finally, based on Mr. Manus's clear violation of the Court's instructions and Rule 615, the credibility of all of his testimony is called into serious question.

23.     Mr. May, Ms. Drayer, and Mr. Manus occupied positions of considerable authority within the ADC. Yet, they expressed widely divergent opinions about the meaning of ¶ 4 of Section J of the ADC's grievance procedures. This should make it clear to Mr. May and other ADC officials that ¶ 4 contains vague and over broad language which must be revised so that it *clearly articulates*: (a) the limited circumstances under which a disciplinary can be filed against an inmate for allegedly making false statements in an informal resolution or grievance; and (b) the limited number of officials who have the authority to issue such a disciplinary.

24.     Defendant Stephenson unequivocally testified that, by 2001 or 2002, he had the clear understanding that a guard could *never* write a disciplinary against a prisoner for allegedly making false statements about the guard in an informal resolution or grievance. The Court finds *no credible evidence* to support the suggestion that, in the months or weeks before the June 22 incident, Defendant Stephenson had some discussion with Mr. Manus which caused Defendant Stephenson

to form the "mistaken belief" that he did have the authority to issue the June 27 disciplinary against Plaintiff. Thus, in writing the June 27 disciplinary, the Court finds Defendant Stephenson *knew* he was doing something that he lacked the authority to do.

25.    Yet, without consulting any of his superiors to ask if he could write such a disciplinary, which on its face appeared to be "retaliatory," Defendant Stephenson proceeded to do so. Far more importantly, however, Defendant Stephenson *knew* that the charges in the June 27 disciplinary were *false* because he, in fact, had used the profanity and issued the threat described by Plaintiff in the June 23 informal resolution.

26.    The Court finds by clear and convincing evidence that Defendant Stephenson's *sole motivation* for filing the June 27 disciplinary was to retaliate against Plaintiff for filing the June 23 informal resolution. As explained in earlier findings, Defendant Stephenson was *knowingly untruthful* in asserting in the June 27 disciplinary that Plaintiff had made false statements in the June 23 informal resolution. Defendant Stephenson's *only possible motivation* for writing this *false disciplinary* was to retaliate against Plaintiff for filing the informal resolution and to try to protect himself from being suspended or fired for again cursing and threatening an inmate.

27.    Finally, Defendant Stephenson testified that, at the time he wrote the June 27 disciplinary, he *knew* Plaintiff had a constitutional right to file the June 23 informal resolution as the required first step in accessing the courts. These facts constitute clear and convincing evidence that, in issuing the false and retaliatory disciplinary, Defendant Stephenson acted in willful, reckless, and malicious disregard of Plaintiff's First Amendment right to access the courts.

**D.    Ms. Drayer's Dismissal Of Defendant Stephenson's June 27, 2007 Disciplinary Against Plaintiff**

1.    Ms. Drayer testified that she was the DHO assigned to hear Defendant Stephenson's June 27 disciplinary against Plaintiff. She began working as a DHO in 2005 and was assigned to the ADC's central office in Pine Bluff. According to Ms. Drayer, she is one of six DHOs who is randomly assigned to hear disciplinaries at TMSU.

2.    Ms. Drayer scheduled a hearing on the June 27 disciplinary against Plaintiff for 11:00 a.m. on July 2, 2007. On the morning of July 2, she arrived at TMSU and reviewed the disciplinary file in preparation for the 11:00 a.m. hearing. After discovering that Defendant Stephenson had charged Plaintiff with a disciplinary for allegedly making false statements against him in Plaintiff's June 23 informal resolution, she knew that she would have to dismiss the disciplinary because Defendant Stephenson did *not* have the authority to write such a disciplinary under the ADC's disciplinary and grievance procedures.

3.    At 11:03 a.m. on July 2, only three minutes after the Disciplinary Hearing was scheduled to begin, Ms. Drayer completed the Disciplinary Violation Form documenting the outcome of the disciplinary hearing. *See* DX #13. In this document, she noted that Defendant Stephenson's June 27 disciplinary against Plaintiff was dismissed because "the notice of charges [in the disciplinary] do not support rule violations." *Id.* at 3. Ms. Drayer explained that, based on Defendant Stephenson's lack of authority to write the disciplinary against Plaintiff, the alleged charges in the disciplinary could not support a rule violation by Plaintiff.

4.    Ms. Drayer made it clear that she heard *no testimony* and considered *no evidence* in making her decision to dismiss the June 27 disciplinary. She made no determination whatsoever on

the merits of the charges in the disciplinary and her decision to dismiss the disciplinary was based entirely on procedural grounds, *i.e.*, Defendant Stephenson wrote a disciplinary that was in violation of the ADC's grievance procedures. Importantly, because Ms. Drayer did *not* reach the merits of the charges in the June 27 disciplinary, Defendant Stephenson *cannot* argue, under *Superintendent v. Hill*, 472 U.S. 445 (1985), that a determination was made by a hearing officer that "some evidence" supported the charges in that disciplinary.

**E.    Mr. May's October 17, 2007 Decision Finding That Plaintiff's Grievance Charging Defendant Stephenson With Filing A Retaliatory Disciplinary "Has Merit."**

1.    On July 3, 2007, Plaintiff filed an informal resolution charging that: (a) the June 27 disciplinary Defendant Stephenson filed against him was a "reprisal against me for simply using said grievance procedure"; and (b) "AR835, IV, K, §1 through § 4 [*see* DX #17 at 12] . . . ABSOLUTELY PROHIBITED" Defendant Stephenson from issuing the June 27, 2007 disciplinary. *See* DX #5 (emphasis in original).

2.    On July 10, 2007, Plaintiff filed a grievance, which made the identical charges against Defendant Stephenson contained in the July 3 informal resolution. *See* DX #6.

3.    On July 31, 2007, Mr. Manus *denied* Plaintiff's July 10 grievance because he did not find "any evidence to substantiate your allegation of retaliation on the part of staff." *See* DX #7. Plaintiff appealed the denial of this grievance to Assistant Director May.

4.    On October 17, 2007, Mr. May entered his decision *reversing* Mr. Manus's denial of Plaintiff's July 10, 2007 grievance. *See* DX #8. Among other things, Mr. May found that "*your* [Plaintiff's] *grievance has merit*." *Id.* (emphasis added). In the final sentence of his decision, Mr. May stated that "the officer in question [Defendant Stephenson] has been advised of the proper

steps to be taken in this instance."  *Id.*

5.     During his testimony, Mr. May attempted to qualify his finding that Plaintiff's grievance "has merit" by stating that he only intended to convey that Defendant Stephenson lacked the authority to issue the June 27 disciplinary against Plaintiff, not that Defendant Stephenson's disciplinary was retaliatory.  Mr. May admitted that what he "meant to say" is not what is set forth in his written decision, which states only that Plaintiff's grievance, charging that Defendant Stephenson issued a retaliatory disciplinary, "has merit."  *See* DX #8.  Mr. May also acknowledged that he should have used other language in his October 17, 2007 decision to get across what he now contends he really meant in finding that Plaintiff's grievance "has merit."

6.     During his testimony, Defendant Stephenson stated that, just before the beginning of the August 27 evidentiary hearing, Mr. May explained to him, in the back of the courtroom, the proper steps he should have taken in charging Plaintiff with the June 27 disciplinary.  Mr. May categorically denied having any such discussion with Defendant Stephenson on August 27, and he had *no recollection* of ever talking with Defendant Stephenson about how the June 27 disciplinary could have been properly filed against Plaintiff.

7.     Finally, even though the last sentence of the October 17 decision states that "the officer in question has been advised of the proper steps to be taken in this instance," Mr. May admitted that he never talked with Defendant Stephenson about those "proper steps."  Rather, Mr. May testified that he thought he probably called Warden White or Mr. Manus and told one of them to have this discussion with Defendant Stephenson.  He admitted he should have followed up with either Mr. White or Mr. Manus to make sure they had discussed this matter with Defendant Stephenson.

8.      According to Defendant Stephenson, between October 17, 2007, and November 13, 2007, the date Plaintiff filed this lawsuit, *no one* ever talked to him about the "proper steps" he should have taken in charging Plaintiff with the June 27 disciplinary.

9.      Mr. May, Mr. Manus, and Ms. Drayer all admitted that, even under their divergent understandings of ¶ 4 of Section J of the ADC's grievance procedures, Defendant Stephenson was "absolutely prohibited" from writing the June 27 disciplinary against Plaintiff.  All three also admitted that, on its face, Defendant Stephenson's June 27 disciplinary against Plaintiff appeared to be retaliatory.  *If* the ADC is genuinely committed to preventing guards from issuing retaliatory disciplinaries, it is difficult to understand why: (1) no one ever admonished Defendant Stephenson for writing this disciplinary and explained to him the proper steps that should have been taken in issuing the disciplinary;[19] and (2) the ADC still has not revised ¶ 4 of Section J to make clear the limited circumstances under which an inmate can be charged with a disciplinary for making an allegedly false statement in an informal resolution or grievance and the limited number of individuals who have the authority to issue such a disciplinary.

## F.      Liability

1.      In *Meuir v. Greene County Jail Employees,* 487 F.3d 1115, 1119 (8th Cir. 2007), the Court held that the essential elements of a retaliatory disciplinary claim are as follows:

---

[19]Mr. May never explained why he stated in his October 17, 2007 decision that Defendant Stephenson "*has been advised* of the proper steps to be taken" when he had no way of knowing if that statement was true.  *See* DX #8.

Paragraph 4 of Section K provides that: "If reprisal or retaliation is suspected and/or determined after the unit/center investigation, the grievance shall be forwarded to Internal Affairs for further review with all relevant documentation."  *See* DX #17 at 12.  After Mr. May entered his October 17, 2007 decision finding that Plaintiff's July 10 grievance "has merit," he did *not* forward Plaintiff's grievance to Internal Affairs for an investigation of whether Defendant Stephenson's June 27 disciplinary was "retaliation," as required by paragraph 4 of Section K.

(a)      The prisoner exercised a constitutionally protected right;

(b)      Prison officials disciplined the prisoner; and

(c)      Exercising the [constitutional] right was the motivation for the discipline.

Based on the Court's previous findings, Plaintiff has proved by a preponderance of the evidence each of these essential elements.[20] Therefore, Plaintiff is entitled to a Judgment against Defendant Stephenson for issuing the false and retaliatory disciplinary, which resulted in him spending six days on DCR.

## G.    Damages

1.      Defendant Stephenson wrote the June 27 disciplinary at 8:15 a.m. *See* DX # 9. Forty minutes later, Plaintiff was removed from his cell in Barracks 3, placed on Disciplinary Court Review ("DCR"), and transferred to a cell in Barracks 5.[21]

---

[20]Even though Ms. Drayer ultimately dismissed the disciplinary on July 2, Plaintiff was still forced to spend six days on DCR, with five of those days being spent in the East Isolation Unit. Being summarily placed on DCR, until there is a decision on the merits of the pending disciplinary, constitutes the "imposition of discipline," the second essential element necessary to prove a retaliatory disciplinary. Otherwise, guards would be free to file retaliatory disciplinaries, knowing that, while they later would be dismissed, the prisoner would be forced to leave his cell, relocate to another cell in a DCR barracks, or, possibly, be placed in cells in administrative segregation or isolation. This would have an obvious *chilling effect* on inmates' use of the grievance procedure to pursue constitutional claims.

The Eighth Circuit has made it clear that the dismissal of a disciplinary charge does not defeat a retaliatory disciplinary claim because "the retaliatory *filing* of a disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances." *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994) (emphasis added); *see also Chambers v. Warren*, case no. 95-1768, 1995 WL 704323 (8th Cir. Dec. 1, 1994) (unpublished opinion) explaining that the "injury inheres at the time the retaliatory charge is *filed*") (emphasis added).

[21]All of the cells in Barracks 3 and 5 are one-man cells.

2.     Plaintiff admitted that being placed on DCR did not change his assignment status. He also acknowledged that, with only minor differences, he had the *same privileges* in Barracks 5 that he enjoyed in Barracks 3.[22]

3.     At 8:05 p.m. on June 28, 2007, Plaintiff was removed from his cell in Barracks 5 and taken to a one-man cell in the East Isolation Unit.  Mr. Manus testified that this is where inmates are taken *to be punished,* after they are convicted of a disciplinary violation.[23]  According to Mr. Manus, "Ms. Vanita King," is the "central classification officer" who ordered that Plaintiff be "moved to Isolation Cellblock to make available bed space for incoming punitive or forty-eight hour relief inmates."[24]

4.     Ms. King was *not* available to testify during the evidentiary hearing.  Mr. May and Mr. Manus testified that Defendant Stephenson would have had no role or involvement in what they described as solely Ms. King's decision to assign Plaintiff to the East Isolation Unit.

---

[22]Both those barracks were air conditioned, and both cells were the same size.  Plaintiff was allowed to take his personal property with him to the new cell he occupied in Barracks 5.  While being placed on DCR prevented Plaintiff from going to the library or chow hall for meals, law books could be brought to his cell in Barracks 5, and he received the same food he would have received at chow hall, but it was now delivered to his cell in Barracks 5.  There were also minor differences in the times that Plaintiff was allowed to shower and when he was allowed to exercise while he was on DCR in Barracks 5.

[23]According to Mr. Manus, Plaintiff was allowed to keep his property in his cell in the East Isolation Unit and his privileges.  In contrast, prisoners who are taken to one of the isolation units for punishment (*i.e.* punitive isolation) are not allowed to have any property in their cells and lose all of their privileges.

[24]The ADC transfer orders issued by Ms. King were provided to the Court by Defendant Stephenson's attorneys on August 19, 2008.  To have a complete record, the Court will admit those documents into evidence as Court's Exhibit #2.

5.      Defendant Stephenson also testified that he had nothing to do with the decision to have Plaintiff transferred to the East Isolation Unit on June 28.  According to Defendant Stephenson, shortly after the scheduled disciplinary hearing on July 2, he found out that Ms. Drayer had dismissed his disciplinary against Plaintiff.  At about the same time, someone told him that Plaintiff had spent the last four or five days on DCR in the East Isolation Unit.  Defendant Stephenson admitted that, after he learned these facts, he did not apologize to Plaintiff for causing him to spend *five days* in the East Isolation Unit awaiting a disciplinary hearing on a disciplinary that, at a minimum, he did not have the authority to issue.  The Court finds that Defendant Stephenson's lack of concern for the consequences of his misconduct and how it had wrongfully affected Plaintiff is further evidence that he acted willfully and maliciously in violating Plaintiff's constitutional rights.

6.      The Court finds no evidence that Defendant Stephenson had any role in the decision to transfer Plaintiff to the East Isolation Unit on June 28.  However, the fact that Plaintiff was "arbitrarily selected" for transfer to the East Isolation Unit, after receiving an obviously retaliatory disciplinary from Defendant Stephenson, creates at least the suspicion that Plaintiff may not have been "randomly selected" to go to the East Isolation Unit.

7.      Plaintiff was held in the East Isolation Unit from 8:05 p.m. on June 28, 2007, until he was returned to his cell in Barracks 3 at 7:30 p.m. on July 2, 2007.   *See* Court's Exhibit #2. Ms. King's transfer order reflects that he was being returned to his cell in Barracks 3 because he was found "not guilty" of violating Rules 12-1 and 13-1 "per: disciplinary court."  *Id.* According to Defendant's Exhibit #13 and Ms. Drayer's testimony, she found Plaintiff not guilty of the two alleged rules violations and dismissed Defendant Stephenson's disciplinary at 11:05 a.m. on July 2. Nevertheless, Plaintiff continued to remain on DCR in the East Isolation Unit for eight and one-half

more hours before being returned to his cell in Barracks 3. The only explanation any witness could give for this eight and one-half hour delay came from Mr. Manus. He testified that inmates are always transferred from one cell to another "on the evening shift," some time after 6:00 p.m. and before midnight.

8.      According to Plaintiff, none of the cells in the East and West Isolation Units are air conditioned, and the only ventilation comes from a "forced air system," which blows outside air into the cells. Mr. Manus confirmed that the isolation units are not air conditioned and are only ventilated by a "forced air system."

9.      During the five days that Plaintiff was on DCR in the East Isolation Unit, he testified that afternoon temperatures in his cell were in the "nineties." Knowing how hot it gets in late June and early July, the Court finds this testimony to be credible.[25] Given Arkansas's high summer humidity, the heat index would have caused those temperatures to feel hotter. Importantly, Plaintiff testified that drinking water was readily available to him in his cell, and there is no evidence that he suffered dehydration or any other ill effects from the heat.

_____

[25]During Mr. Manus's testimony, he stated that he brought with him the temperature log at TMSU for the months of June and July, 2007, "just in case someone asked . . . ." This strongly suggests that, on his ride back to TMSU with Defendant Stephenson on August 27, Mr. Manus found out about Plaintiff's testimony regarding the temperature and humidity inside his cell in the East Isolation Unit.

Even though the temperature log was *not* listed on Defendant's Exhibit List, the Court allowed it to be introduced into evidence as DX #20. The highest hourly temperature on June 28 through July 2 is reflected as 91 degrees.

The Court now realizes that, in order for this document to have been properly admitted into evidence, it should have been included on Defendant's Exhibit List. Because it was not, the Court will only consider it to the extent it has any value in impeaching Plaintiff's testimony that the temperature inside his cell in the East Isolation Unit was in the 90's.

10.     Plaintiff also testified that, during the five days he was in the East Isolation Unit, his cell was filled with mosquitoes that came in through: (1) "the forced air system"; and (2) doors at the end of the cell block which were kept open to assist with ventilation and to move prisoners into the caged exercise runs.  Plaintiff testified that he sustained multiple mosquito bites during the five days he was in the East Isolation Unit.[26]  However, he acknowledged that he did not seek or require any medical attention from the infirmary for the heat and mosquitoes he endured in the East Isolation Unit.

11.     Finally, Plaintiff testified that, while he was in the East Isolation Unit, he only received a shower every three days and his exercise privileges were reduced to one hour a day in one of the caged exercise runs.

12.     The PLRA provides, in pertinent part, that: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).   In *Royal v. Kautzky,* 375 F.3d 720, 723 (8th Cir. 2004), the Court held that the PLRA's physical injury rule applies to *all lawsuits* brought by prisoners, even if it is a constitutional claim which, by its very nature, does not involve any type of physical injury.[27]  *Id.*  The Court also clarified that, while

_____

[26]Mr. Manus testified that there were just as many mosquitoes in the air-conditioned barracks at TMSU as there were in the cells in the East and West Isolation Units.  According to Mr. Manus, mosquitoes are "in every cell [in TMSU] . . . including my house on the grounds . . . .  Mosquitoes are everywhere."

[27] The majority of Circuit Courts agree that the physical injury rule applies to *all lawsuits* filed by prisoners.  *See Thompson v. Carter*, 284 F.3d 411, 416 (2nd Cir. 2002); *Allah v. Al-Hafeez*, 226 F.3d 247, 250-51 (3d Cir. 2000); *Geiger v. Jowers,* 404 F.3d 371, 375 (5th Cir. 2005); *Rowe v. Shake*, 196 F.3d 778, 781-82 (7th Cir. 1999); *Searles v. Van Bebber,* 251 F.3d 869, 876 (10th Cir. 2001); *Hughes v. Lott,* 350 F.3d 1157, 1162-63 (11th Cir. 2003); *Davis v. District of Columbia*, 158 F.3d 1342, 1349 (D.C. Cir. 1998).  Only the Ninth Circuit has held that the physical injury rule *does*

compensatory damages are precluded by the PLRA, if there is no showing of a physical injury, a prisoner can obtain nominal damages, punitive damages, and equitable injunctive relief for the constitutional violation. *Id.*

13.     The Court finds that, during the one day Plaintiff spent on DCR in Barracks 5, he did *not* sustain any "physical injury." During the five days that Plaintiff spent on DCR in the East Isolation Unit, he undoubtedly had to contend with uncomfortably high heat and humidity and mosquitoes. However, he had water available to him in his cell, and there is no evidence he sustained any "physical injury" from the heat and mosquito bites he endured. Thus, the Court finds that Plaintiff has failed to prove that he sustained a "physical injury" as a result of Defendant Stephenson's violation of his First Amendment rights.

14.     Because Plaintiff has not suffered a "physical injury," he is not entitled to an award of compensatory damages. However, the Court finds that Plaintiff is entitled to an award of nominal damages against Defendant Stephenson in the sum of $1.00.

15.     Under appropriate circumstances, a prisoner may recover punitive damages based only on an award of nominal damages. *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2622 (2008); *Royal,* 375 F.3d at 724-25. As the United States Supreme Court has recognized, a prisoner may recover punitive damages in a § 1983 action when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997). The Eighth Circuit has explained that, when determining the amount of a punitive

---

*not* apply to First and Fourteenth Amendment claims that do not, by their very nature, involve any type of physical injury. *See Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998).

damage award, a court should consider the two purposes of punitive damages: (1) to punish willful or malicious conduct; and (2) to deter similar future misconduct. *Royal*, 375 F.3d at 724; *see also Coleman v. Rahija,* 114 F.3d 778, 787 (8th Cir. 1997).

16. As previously explained, Plaintiff has proven by clear and convincing evidence that, in issuing Plaintiff a false and retaliatory disciplinary, Defendant Stephenson "was motivated by evil motives or intent" and acted with willful, knowing, malicious, and reckless disregard for Plaintiff's First Amendment right to access the courts. Thus, the Court finds that Plaintiff is entitled to recover punitive damages from Defendant Stephenson for this constitutional violation.[28]

17. During the evidentiary hearing, Defendant Stephenson's financial information was introduced into evidence, under seal, as Court's Exhibit #1. On the last page of this financial information, Defendant Stephenson reported that his 2007 net after tax earnings were approximately $33,000.[29] The Court finds that $2,500 is a reasonable and appropriate amount of punitive damages to punish Defendant Stephenson for his willful, reckless, and malicious conduct in violating Plaintiff's constitutional rights, while at the same time deterring other guards at the ADC from engaging in similar misconduct. Furthermore, the Court concludes that the amount of the punitive damages award comports with the requirements of the due process clause.[30]

---

[28]*See* 8th CIR. CIVIL JURY INSTR. § 4.05C (2007).

[29]The final two-week pay period of 2007 is not reflected on Court's Exhibit #1. This final pay period should have added approximately $1,100 of net income to the $31,862.97 year-to-date figure reflected on Court's Exhibit #1.

[30]In evaluating whether an award of punitive damages comports with due process, three "guideposts" must be considered: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v.*

## III. Conclusion

Consistent with the foregoing Findings of Fact and Conclusions of Law, Plaintiff has maintained his burden of proving his § 1983 retaliatory discharge claim against Defendant Stephenson and is entitled to recover: (1) $1.00 in nominal damages; and (2) $2,500 in punitive damages.

---

*Campbell,* 538 U.S. 408, 418 (2003); *see also BMW of North America., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

When evaluating the reprehensibility of the defendant's conduct, a court may consider, among other factors, whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419; *Gore*, 517 U.S. at 576-77. As previously explained, the Court finds that Defendant Stephenson acted with intentional malice and deceit.

With regard to the second factor, the Eighth Circuit has recently explained that, unlike the ratio between compensatory and punitive damages, the ration between nominal and punitive damages "will necessarily be large." *JCB, Inc. v. Union Planters Bank*, __ F.3d __, 2008 WL 3897384, *9 (8th Cir. 2008)(slip opinion to be published) (awarding $108,750 in punitive damages and $1 in nominal damages in a trespass case); *see also Campbell*, 538 U.S. at 425 (stating that a higher ratio is appropriate when the "injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine").

Finally, the Court is unaware of any civil statutory penalties applicable in this case. In such instances, other courts have compared the amount of punitive damages to awards in similar cases. *See, e.g., Gibson v. Moskowitz*, 523 F.3d 657, 665 (6th Cir. 2008); *Estate of Moreland v. Dieter*, 395 F.3d 747, 758 (7th Cir. 2005). After careful consideration, the Court concludes that an award of $2,500 in punitive damages is consistent with awards entered in other prisoner § 1983 retaliation cases. *See, e.g., Scher v. Engelke*, 943 F.2d 921 (8th Cir. 1991) (awarding $1,000 in punitive damages); *Bell v. Johnson*, 404 F.3d 997 (6th Cir. 2005) (awarding $28,000 in punitive damages); *Siggers-El v. Barlow*, 433 F. Supp.2d 811 (E.D. Mich. 2006) (awarding $200,000 in punitive damages).

Finally, in compliance with recent Supreme Court directives, the Court emphasizes that the amount of the punitive damage awarded against Defendant Stephenson is based solely on his retaliatory conduct towards Plaintiff Haynes, and *not* for his conduct towards any other inmates. *See Philip Morris USA v. Williams*, 127 S.Ct. 1057, 1064-65 (2007) (clarifying that a defendant may not be punished, with an award of punitive damages, for the harm caused to persons other than the plaintiff).

IT IS THEREFORE RECOMMENDED that the Court adopt this Recommended Disposition and that Judgment be entered in favor of Plaintiff and against Defendant Stephenson in the sum of $2,501.00.

DATED this 19th day of September, 2008.

_____
UNITED STATES MAGISTRATE JUDGE